

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 38th Floor*
*New York, New York 10278*

July 26, 2024

**By ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

    Re:    *United States v. Lydell Seymore*, 22 CR 56 (JMF) / 22 CR 343 (JMF)

Dear Judge Furman,

    The Government respectfully submits this letter in advance of the defendant's sentencing, currently scheduled to proceed on Tuesday, July 30, 2024, at 10:00 AM. For the reasons set out below, the Government submits that a sentence within the range of 324 to 360 months, a range that is consistent with the multiple plea agreements between the parties and that also lies within the applicable range of 324 to 405 months under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing, in particular here, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to avoid unwarranted sentence disparities among defendants, and to protect society from further crimes of the defendant.[1]

## Background

### 1. Background on WashSide, a/k/a "Wash," and "Everything4DayDay," a/k/a "E4D"

    The defendant was a member of a violent street gang known as "WashSide" or "Wash." He was also an associate of a subset of "Wash," known as Everything4DayDay or more commonly E4D. (Presentence Investigation Report dated June 11, 2024 ("PSR") ¶ 30). Wash was based in the neighborhood in the vicinity of the intersection of Washington Avenue and East 169th Street in the Bronx from at least 2015 through 2022. (PSR ¶ 31). This neighborhood runs along its namesake Washington Avenue and encompasses the Morris Houses, a large public housing

---

[1] The recommendation of the Government is made in cognizance of the previously imposed sentences in this case, which are detailed in the table below, and particularly the sentence of 264 months' imprisonment recently imposed upon Co-Defendant Boss Terrell, a now relevant data point pursuant to one of the statutory sentencing factors. *See* 18 U.S.C. § 3553(a)(6).

development that lies on both sides of Washington Avenue between East 169th Street and East 170th Street. (PSR ¶ 31). Members of Wash were largely current or former residents of this neighborhood who publicly professed loyalty to the neighborhood and each other through public social media posts. (PSR ¶ 31).

Members of Wash participated in numerous violent acts, including acts of violence against rival gang members and robberies, as well as transported stolen property interstate as part of a wide-ranging campaign of pillaging numerous commercial establishments stretching from New England throughout the Northeast, Mid-Atlantic, South, and Midwest, sold controlled substances, and stole credit and debit cards for the purpose of committing wire and access device fraud. (PSR ¶ 32).

Wash consisted of a core membership that shared the common aims of protecting the territory of the gang, enriching the members of the gang through robbery, larceny, fraud, and drug trafficking, and enhancing the reputation of the gang by engaging in acts of violence against members of rival gangs. (PSR ¶ 33). Wash controlled the territory of its neighborhood where only its members and associates were permitted to congregate and move freely and sell drugs. (PSR ¶ 33). The members of Wash were expected to make money for the gang and to engage in acts of violence to protect the gang's territory and to target the members of rival gangs. (PSR ¶ 33). When members of Wash committed acts of violence, they gained heightened status within the gang, in that other members and associates respected the members who committed the violence more because of their acts of violence. (PSR ¶ 33). Additionally, members of Wash advertised the gang and glorified its criminal activities through social media posts. (PSR ¶ 33).



In this respect, the defendant himself posted photographs reflecting his status as a member of Wash for multiple years leading up to his arrest in or about January 2022, including expressions of solidarity with incarcerated members of Wash. For example, on December 30, 2020, the defendant posted a set of photographs on Facebook depicting multiple members and associates of Wash, including Co-Defendants Yaurel Centeno, Isaiah Thomas, and Mamadou Diallo, with the accompanying caption, "Free My Demons." At the time of the post, Centeno, Thomas, and Diallo were all incarcerated on various federal and state cases, all of which involved offense conduct tied to Wash. Though less active on social media than some other members of the gang, the defendant regularly appeared in the posts of other members of Wash, who celebrated his membership and status as a "shooter," even long before the murder of Tyrone Almodovar, a/k/a "Benji," whom the defendant shot to death, as discussed in detail below, in June 2020. For example, as shown on the right, on May 16, 2019, a member of Wash posted a photograph on Facebook depicting the masked defendant and another member of Wash together with a caption that read, in most relevant part, "Couple of Shooters in All Black" and "Wash 4 Lyfe." Later, on September 7, 2022—when the defendant was already detained in connection with this case but prior to the arrest of the majority of his co-defendants—Co-Defendant Rasheed Chapman posted an earlier photograph depicting Chapman, the defendant, and other members of Wash, standing in front of a sign for the New York City Housing Authority's McKinley Houses, the territory of Six Third, the rival gang to which

Tyrone Almodovar belonged. In the photograph, the members of Wash are displaying hand signs, including a hand sign for Wash, which both the defendant and Chapman display, thereby staking their claim to the heart of the territory of the "opps." An audio recording that accompanies the post begins, "Can't go, can't go like Benji," a reference to the murder of Tyrone Almodovar, a/k/a "Benji," the member of Six Third whom the defendant shot to death.

As stated above, Wash had rival gangs, which its members referred to as "opps," and which were similarly rooted in nearby neighborhoods. (PSR ¶ 34). From 2015 to 2022, members of Wash and members of other local rival gangs would initiate violence against each other whenever and wherever they saw one another, whether in one another territory's or elsewhere. (PSR ¶ 36). The members of Wash and the rival gangs would then post on social media to brag about their shootings, taunt one another and promote their respective gangs on a regular basis.

Members of Wash armed themselves and committed multiple acts of violence against rival gang members, including killing a rival gang member, Tyrone Almodovar, on June 26, 2022, a murder in which the defendant participated and was the lone shooter, as further discussed below. (PSR ¶¶ 37-43). Wash members attempted to kill other rivals on numerous occasions, including a shooting on July 29, 2020 (PSR ¶¶ 47-50), a shooting on August 31, 2021, which involved two young women being shot in the legs (PSR ¶¶ 58-59),[2] and a shooting on August 19, 2022, where an innocent man was shot (PSR ¶¶ 65-69). On at least one occasion, Wash members viciously attacked and beat a rival gang member, kicking and stomping his head and thereafter slashing him in the back. (PSR ¶ 57). Wash members also participated in a violent armed robbery, where innocent store employees were thrown to the ground and had firearms pressed to their heads, (PSR ¶¶ 44-46),[3] two violent, armed carjackings, the second of which in December 2021 the defendant organized, luring a marihuana dealer close to the defendant's residence in the territory of Wash, where the defendant then carjacked the victim whom he held at gunpoint, as discussed further below (PSR ¶¶ 60-64), and the robbery and theft of numerous businesses in New York and beyond, as stated above, which stretched from New England throughout the Northeast, Mid-Atlantic, South, and Midwest (PSR ¶¶ 32, 51-56, 70-71). Particularly during the height of the pandemic in 2020 and 2021, members of Wash, including the defendant, were regularly driving out from the city and the state in small bands to steal electronic goods, typically iPhones, iPads, and their accessories, from chain retailers such as Best Buy, Target, T-Mobile, and AT&T. The members of Wash and their associates typically just walked into a store, identified where such goods were located, and then broke them out of display cases, striking and throwing to the ground any store employees or members of the public who offered resistance, sometimes with significant violence. (PSR ¶ 70). In total, members of Wash took merchandise in excess of $250,000 from at least nineteen states, often hitting several stores on a single day and typically returning to New York

---

[2] As in the prior sentencing proceedings and for uniformity of the record, the Government respectfully requests that the second sentence of PSR ¶ 59 be revised to state, "The two young women were both taken to hospital, one by ambulance and one by a private car before an ambulance arrived."

[3] The car that Co-Defendants Yaurel Centeno, Isaiah Thomas, Jacob Baker, and Tyshawn Brogdon used to commit this pawnshop robbery on June 27, 2020 was the same car from which the defendant had shot Tyrone Almodovar one night earlier on June 26, 2020.

City after extended campaigns to sell their raiding spoils to a small number of resellers of stolen goods with whom they worked on a collective basis. (PSR ¶ 71).

Finally, from at least 2015 through 2022, Wash members regularly stole credit and debit cards from movie theatre patrons, and then used the stolen cards to purchase electronic goods and luxury clothing, resulting in more than $150,000 of fraudulently obtained goods. (PSR ¶¶ 72-73).

### 2. Seymore's Participation in the June 26, 2020 Murder

On the evening of June 26, 2020, amidst the height of the coronavirus pandemic, the defendant and Co-Defendants Boss Terrell, Yaurel Centeno, and Darrell Spencer, among other members of Wash, were congregated on the street in front of 3480 Third Avenue, where the defendant resided, in the territory of Wash. (PSR ¶ 38). There, Tyrone Almodovar, a/k/a "Benji," a member of Six Third, a rival gang of Wash based in a nearby public housing development, drove past the members of Wash inside a taxi. (PSR ¶ 38). As Almodovar passed, he opened his window and shouted "Boss SMD" (*i.e.*, "Boss Terrell Suck My Dick") and then "WashK" (*i.e.*, "Wash Killer"). (PSR ¶ 38). In response, Terrell stated, "Who's going to do it?" after which the defendant, who entered Terrell's parked car, stated, "Give it to me." (PSR ¶ 39). At the time, Terrell's question amounted to a direction for one of the members of Wash who was present to shoot and kill Almodovar. The defendant's response referred to a firearm, specifically a black pistol that Terrell possessed earlier in the evening and supplied to the defendant. (PSR ¶ 39). With the defendant in the car, Terrell then drove off in pursuit of the taxi. (PSR ¶ 39). In short order, Spencer entered his car and followed Terrell and the defendant, after which Centeno entered his car and followed Terrell and the defendant and Spencer. (PSR ¶ 39).

After racing for several blocks, the three cars that members of Wash were driving boxed in the taxi. (PSR ¶ 40). In particular, the taxi momentarily came to a stop with Spencer's car having cut off the taxi with Spencer's car directly in front of the taxi, almost perpendicular to the direction of traffic on East 168th Street, and preventing the taxi from driving forward. (PSR ¶ 40). The defendant's car pulled up to the side and rear of the taxi on the right side, preventing it from moving backwards in that direction. (PSR ¶ 40). As the taxi began to back straight up, the taxi hit Centeno's car, which had pulled up immediately behind the taxi to block it further. (PSR ¶ 40). At this time, the defendant held the black pistol out of a window of Terrell's car and shot once or twice, hitting Almodovar, who was still seated in the taxi, in the head. (PSR ¶ 40). Following the shooting, the defendant returned with Terrell to 3480 Third Avenue, where both of them were depicted in video recordings obtained from surveillance cameras, entering the building, in no rush and in the company of multiple other members of Wash, before the defendant eventually proceeded upstairs toward the vicinity of his family's residence.

A short time later, members of the NYPD responded to a crime scene at the intersection of East 163rd Street and Tinton Avenue in the territory of Six Third where the taxi had driven and stopped after the shooting. (PSR ¶ 37). The members of the NYPD found Almodovar in the taxi, dead of a fatal gunshot wound to his head that substantially blew apart one area of his skull. (PSR ¶ 37).

The brutal attack occurred within the context of mounting violence between Six Third and Wash and Almodovar and Terrell, in particular. In 2019, Almodovar and another member of Six

Third had attacked Terrell, ripping out one of his dreadlocks, which inspired a posse of members of Wash, including Terrell and Co-Defendants Isaiah Thomas and Jacob Baker, to return the following day to launch an attack in the territory of Six Third where they were scattered by gunfire. (PSR ¶ 41).

In the immediate wake of the murder and in the months and years that followed, members of Wash publicly and privately celebrated their killing of Almodovar with a recurring emphasis on language that demeaned the rival whom they killed. (PSR ¶ 42).

Approximately two months after the defendant committed this shooting with Terrell, on August 29, 2020 in a recorded jail call, Terrell discussed with Centeno, who was incarcerated in federal custody, the defendant's and his own involvement in a different violent rivalry between Wash and Spectway, another rival gang of Wash. In the recorded telephone conversation, Terrell informed Centeno, that the prior evening, on August 28, 2020 or August 29, 2020, Terrell and the defendant had been out all night "spinning" the "opp blocks," driving through "Six Third" and then "Six Sev," a reference to Spectway, which is also known as Sevway (*i.e.*, Six Sev or Sev for Seventh or 167th for East 167th Street). Terrell described to Centeno how at one point, the defendant performed a U-turn, at which point Terrell lowered the window and the "opps" all started to panic and run. (PSR ¶ 49).

### 3. Seymore's Participation in the December 30, 2021 Carjacking

On December 30, 2021, together with Co-Defendant Mamadou Diallo, the defendant participated in a gunpoint carjacking of a marihuana dealer, which the defendant organized. The carjacking occurred less than two blocks away from the apartment building in which the defendant and Diallo both resided at the time, in the heart of the territory of Wash. (PSR ¶¶ 62, 64). Having lured the victim, a marihuana dealer, to the neighborhood under the pretense of ordering marihuana for delivery, the defendant together with Diallo got into the victim's car, a BMW, at the arranged time. Once inside the car, the defendant, who possessed the firearm at all relevant times, held the victim at gunpoint and robbed the victim not only of his drugs and his car, but also much of his clothing. In this respect, after the defendant pressed the firearm into the body of the victim, he remained in the car but continued to hold the victim with the drawn firearm. At this time, the defendant ordered the victim to get out of the car, at which point Diallo got out of the car as well and stripped the victim of his jacket, his sweatshirt, and his belt, together with his cellphone, leaving the victim in a t-shirt and jeans in the middle of a winter night in the Bronx. (PSR ¶ 63). After parking the victim's car a short distance away, the defendant and Diallo took photographs of the stolen car, perhaps in contemplation of trying to resell it, and then walked back home, with each of them entering their building carrying different spoils of the carjacking. (PSR ¶ 64).[4] Indeed, the defendant is depicted returning to the building wearing the distinct luxury brand vest of the victim, which the defendant was similarly wearing just over a day later when he was arrested

---

[4] With the assistance of the victim, members of the New York City Police Department located the stolen car later that same evening after the victim was able to track the car with access to a borrowed cellphone. (*See* PSR ¶ 63).

on the street by members of the NYPD who found him in possession of a firearm, as described further below, in the first hours of the new year on January 1, 2022. (PSR ¶ 64).

### 4. Seymore's Participation in Robberies and Larcenies Outside New York City

As stated above, the investigation of Wash identified numerous robberies and larcenies committed outside New York City for which small bands of Wash members and Wash associates were the perpetrators at so-called "big box" retailers and other chain stores selling high-value and fungible digital devices, such as iPhones, iPads, and their accessories. The defendant joined these raiding parties, as evidenced through posts on social media over multiple years that depict him together with other members of Wash displaying the products and cash proceeds of this sustained lawlessness and also through his participation in multiple forays involving *at least* eight targeted locations between *at least* in or about May 2020 and September 2020 in *at least* five states (New York, Pennsylvania, Massachusetts, Ohio, and Alabama).

As discussed in connection with the sentencing proceedings for Co-Defendant Mamadou Diallo, with whom the defendant often committed these robberies and larcenies, in one case, on which the Government has received information from the Medina County Prosecutor's Office in Medina, Ohio, the defendant was charged with robbery alongside Diallo and another associate of Wash in Wadsworth, Ohio, though the juvenile court proceedings there against the defendant do not appear to have ever progressed because the defendant, unlike Diallo, was never brought back to the jurisdiction during any of his subsequent periods of brief detention in state court proceedings prior to his arrest here. In this case, on September 15, 2020, the defendant and his two accomplices entered a Target in Wadsworth, Ohio, where acting in concert they stole over $5,000 of Apple AirPods, iPads, and TVs. In what was the standard modus operandi for the members of Wash, including the defendant, the defendant, Diallo and the associate of Wash, entered the store together, identifying the high-value electronics items they intended to target. On this occasion, the defendant then walked out of the store and prepared the waiting car, which he drove, for a fast escape. Next, the associate of Wash asked a store employee to open the locked display cabinet for the products, after which Diallo grabbed the employee and threw him back and away from the cabinet. From there, Diallo plundered the cabinet and ran out of the store, where he and the associate of Wash piled into the car that the defendant drove away from the scene. The robbery was reported immediately, and local police officers intercepted the defendant and his accomplices, leading to a high-speed chase on the highway that was abandoned because the defendant drove at such a high rate of speed that it was deemed unsafe to pursue.

As detailed in the PSR, later that same day, on September 15, 2020, the defendant was involved in another high-speed chase with law enforcement in Pennsylvania. (*See* PSR ¶ 136). After being pulled over by a trooper of the state police on a highway in Pennsylvania, the defendant, who was still driving with Diallo and now two other associates of Wash, tore away during the middle of a car stop with the trooper beside the car, after which he was pursued for approximately six miles at speeds above 100 miles per hour before he crashed into the median of I-80, a large, four-lane interstate highway. (PSR ¶ 136). After crashing, the defendant and the others ran from the crash, amidst oncoming traffic, before multiple troopers of the state police apprehended them at gunpoint. (PSR ¶ 136). Following his arrest and detention from approximately September 16, 2020 to October 6, 2020, the defendant was identified as the

perpetrator of a string of larcenies committed earlier in September 2020 at multiple locations in Pennsylvania. (*See* PSR ¶ 137).

### 5. Seymore's Possession and Use of Firearms

As described above, on June 26, 2020, the defendant possessed the firearm that he used to murder Tyrone Almodovar. In addition, on December 31, 2021, the defendant possessed the firearm that he used to carjack the marihuana dealer at gunpoint. On at least two other occasions, the defendant also possessed firearms in the territory of Wash.

First, as detailed in the PSR, on July 23, 2021, approximately one block from his residence in the Bronx, New York, the defendant possessed a .45-caliber, semi-automatic pistol. The firearm was stolen and loaded with six live rounds of ammunition. The defendant displayed the firearm in his waistband to a young woman who rebuffed his aggressive advances, refusing to provide her telephone number as she tried to carry and walk with her two children, ages two and five years old at the time of this predation. The victim's identification of the defendant and willingness to remain available as a witness led to a successful prosecution that was disposed of on the described basis of a misdemeanor firearms-related charge at the Bronx County District Attorney's Office, offered in light of these pending federal court proceedings. (*See* PSR ¶ 138).

Second, as referenced in passing in the PSR, on January 1, 2022, members of the NYPD approached the defendant as he walked out of his same residence in the Bronx, New York, leading to a foot chase of multiple blocks, at the end of which the defendant was apprehended and during which the defendant tossed a .380-caliber semi-automatic pistol, which was defaced and loaded with two live rounds of ammunition. (*See* PSR ¶ 74).

### 6. Procedural Background

Following this last arrest on January 1, 2022, the defendant who was a subject of the investigation underlying this case, was charged by complaint with possessing a defaced firearm, in violation of 18 U.S.C. § 922(k). He was presented on January 2, 2022 and detained and has remained in federal custody since that date.[5] On January 26, 2022, a grand jury sitting in the Southern District of New York voted a one-count Indictment 22 CR 56 (KPF) against the defendant charging him with the same offense.

---

[5] Apart from brief periods of detention of approximately one day or less in connection with other arrests during the time period of the instance offense conduct, the defendant has been incarcerated for the instant offense conduct in two principal time periods: (i) from September 15, 2020 to October 6, 2020, as noted above, and (ii) from January 1, 2022 to the present. During the latter stretch, the defendant was detained at the Essex County Correctional Facility from January 1, 2022 to September 28, 2022, at the Metropolitan Detention Center from September 29, 2022 to February 29, 2024, and at the Hudson County Correctional Facility from March 1, 2024 to the present.

On April 25, 2024, the defendant appeared before the Honorable Katherine Polk Failla, United States District Judge for the Southern District of New York, and pleaded guilty to the charge, after which the case was transferred to the Court.

On or about December 14, 2022, a grand jury sitting in the Southern District of New York voted a S1 Indictment 22 CR 343 (JMF) against the defendant and his ten co-defendants, charging the defendant with one count of participating in a racketeering conspiracy from at least 2015 up to and including December 2022, in violation of 18 U.S.C. § 1962(d) ("Count One"); one count of carjacking, in violation of 18 U.S.C. § 2119(1) ("Count Eighteen"); one count of robbery, in violation of 18 U.S.C. § 1951 ("Count Nineteen"); and one count of using and carrying a firearm during and in relation to and possessing a firearm in furtherance of a crime of violence, which firearm was brandished, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (ii) and 2 ("Count Twenty").

On January 31, 2024, the defendant waived indictment and consented to the filing of a S2 information 22 CR 343 (JMF) against the defendant alone, charging the defendant with one count of participating in a racketeering conspiracy from at least 2015 up to and including December 2022, in violation of 18 U.S.C. § 1962(d) ("Count One"); one count of carjacking, in violation of 18 U.S.C. § 2119(1) ("Count Two"); one count of robbery, in violation of 18 U.S.C. § 1951 ("Count Three"); one count of using and carrying a firearm during and in relation to and possessing a firearm in furtherance of a crime of violence, which firearm was brandished, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (ii) and 2 ("Count Four"); and one count of interstate transportation of stolen property, in violation of 18 U.S.C. §§ 2314 and 2 ("Count Five").

On January 31, 2024, the defendant entered a referred change of plea before the Honorable Robert W. Lehrburger, United States Magistrate Judge for the Southern District of New York, to Count One and Count Five of the S2 Information. On February 1, 2024, the Court accepted the plea.

In terms of the defendant's adjustment to incarceration, on one occasion on January 5, 2023, the defendant refused to obey the order of a corrections officer at the Metropolitan Detention Center to remain off the tier. Otherwise, unlike the majority of his co-defendants who have committed one or more serious acts of violence during their pre-sentencing detention, the defendant has not accumulated a material disciplinary history.

In terms of the defendant's criminal history, the Government concurs with Probation concerning the criminal history it has compiled, much of which was not in the prior possession of the Government. (*See* PSR ¶¶ 135-38).

### 7. Co-Defendants Background

To date, the Court has sentenced five co-defendants, and five co-defendants remain to be sentenced, plus the defendant, as the table below summarizes.

| | Defendant (Age) | Count(s) of Conviction | Principal Admitted Conduct | Guidelines Range | Sentence |
|---|---|---|---|---|---|
| 1 | Boss Terrell (23) | 1959(a)(5)<br>1959(a)(3), (5) | Murder-1 (Shooting)<br>Att. Murder-1 (Shooting)<br>Interstate Stolen Goods | 292 to 360 Months | **07/16/2024**<br>**264 Months** |
| 2 | Yaurel Centeno (22) | 1962(d)<br>1959(a)(5) | Murder-1 (Shooting)<br>Interstate Stolen Goods<br>Multiple Robberies | 360 Months | 09/25/2024 |
| 3 | Lydell Seymore (20) | 1962(d)<br>2314 | Murder-1 (Shooting)<br>Interstate Stolen Goods<br>Carjacking | 292 to 360 Months | 07/30/2024 |
| 4 | Darrell Spencer (26) | 1962(d) | Murder-1 (Shooting)<br>Interstate Stolen Goods | 240 Months | 08/07/2024 |
| 5 * | Isaiah Thomas (25) | 1959(a)(3), (5)<br>924(c)(1)(A)(i)<br>924(c)(1)(A)(i) | Att. Murder-1 (Shooting)<br>Robbery<br>Interstate Stolen Goods | 330 to 382 Months | **06/03/2024**<br>**192 Months** |
| 6 | Jacob Baker (20) | 1962(d)<br>924(c)(1)(A)(i) | Att. Murder-1 (Shooting)<br>Att. Murder-1 (Shooting)<br>Interstate Stolen Goods<br>Carjacking<br>Robbery | 228 to 270 Months | 07/31/2024 |
| 7 | Tyshawn Brogdon (21) | 1962(d)<br>924(c)(1)(A)(i) | Carjacking<br>Robbery<br>Wire Fraud | 147 to 168 Months | 07/31/2024 |
| 8 | Rasheed Chapman (20) | 1959(a)(3), (5)<br>924(c)(1)(A)(i) | Att. Murder-1 (Shooting)<br>Wire Fraud | 181 to 211 Months | 07/30/2024 |
| 9 | Mamadou Diallo (24) | 1962(d) | Carjacking<br>Interstate Stolen Goods | 120 to 150 Months | **05/30/2024**<br>**84 Months** |
| 10 | Antwan Mosley (22) | 1959(a)(3), (5)<br>924(c)(1)(A)(i) | Att. Murder-1 (Shooting)<br>Interstate Stolen Goods<br>Wire Fraud | 181 to 211 Months | **05/14/2024**<br>**120 Months** |
| 11 ** | Noel Car (23) | 1959(a)(3)<br>1028A | Agg. Assault (Slashing)<br>Wire Fraud | 151 to 188 Months | **06/10/2024**<br>**70 Months** |

\* On June 17, 2024, Co-Defendant Isaiah Thomas filed a notice of appeal of the judgment.

\*\* Among the co-defendants, Co-Defendant Noel Carr is the only co-defendant whose status as a career offender under U.S.S.G. § 4B1.1 set the applicable range under the Guidelines. In his case, the Government further recommended a below-Guidelines sentence of 84 months. Finally, the sentence imposed of 70 months was set consecutive to an undischarged term of imprisonment imposed in unrelated state court proceedings of approximately nine months.

### Applicable Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme

Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

The statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, pursuant to which the sentence needs::

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

While a district court may not presume that an appropriate sentence lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a district court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

## **Guidelines**

The Government agrees with the offense-level calculations of Probation, which mirror the calculations of the parties in the two relevant plea agreements, with one immaterial exception.[6]

---

[6] The Government concurs with Probation that a one-point enhancement pursuant to U.S.S.G. § 2B3.1(b)(6) is appropriate in Racketeering Act 3 as to the S2 Information 22 CR 343 (JMF).

The Government disagrees, however, with the criminal-history calculations of Probation, insofar as multiple prior convictions, of which the Government lacked knowledge prior to the defendant's changes of plea, should add zero criminal history points because the underlying conduct was part of the instant offense. *See* U.S.S.G. § 4A1.2(a)(1). In particular, the two convictions in Pennsylvania, as described above, are very much part of the defendant's instant offense, his marauding with other members and associates of Wash outside of New York City and across wide tracts of this country. (*See* PSR ¶¶ 136-37). Thus, grouping the three counts of conviction between the two charging instruments, pursuant to U.S.S.G. § 5G1.2 Application Note 1, the offense level is 40 and the criminal history category is II, not III, and the resulting range under the Guidelines is 324 to 405 months' imprisonment.

## **Sentence**

The Government respectfully submits that a very substantial sentence, one that lies within the range of 324 to 360 months' imprisonment and thus within applicable Guidelines range of 324 to 405 months' imprisonment, is warranted given the seriousness of the offense conduct and in turn the need to provide just punishment and promote respect for the law. The defendant killed Tyrone Almodovar. Although the Government of course stands by its prior statement that Co-Defendant Boss Terrell is the person most responsible for that killing, the defendant took the life, and is thus very close in his culpability to that of his fellow gang member who set the murderous pursuit of the victim in motion at the mildest of provocations, making the murder an even more shocking, horrific, and brutal crime. As emphasized recently in arguing for a greater sentence of 30 years' imprisonment for Terrell, the killing of Tyrone Almodovar is an incomprehensible and unconscionable tragedy. Again, for us to function as a society of law and order, we must affirm that crimes that take a human life, particularly under such gratuitous circumstances, are different and must be approached differently in their prosecution and punishment. Above all else, our criminal laws prize and defend each human life, and the basic covenant that brings us together under those laws cannot hold if we do not honor premeditated murder, let alone premediated murder that is committed by a pack of gang members in the middle of a public street, with the strongest resolve and stiffest punishment. The defendant volunteered to kill Tyrone Almodovar, and he must now face the consequences for it.

There are multiple further arguments, some based in the Guidelines and others the factors of § 3553(a), all of which are rooted in the defendant's offense conduct, that similarly weigh in favor of a very strong sentence.

In terms of the Guidelines, as recently emphasized for Terrell, too, it is most respectfully a "quirk" of the Guidelines approach to the grouping of counts that its application here erases from the defendant's overall offense level multiple serious, dangerous, and violent crimes, including a gunpoint carjacking whose offense level is 29, committed after a first-degree murder, whose group offense level is 43. As previously stated, the Guidelines acknowledge this possible "quirk" and how the Court can, consistent with the Guidelines, address it. In the commentary to U.S.S.G. § 3D1.4, the Guidelines provide, "[i]n unusual circumstances, the approach adopted in this section

---

(*See* PSR ¶ 176). With that said, the Government certainly stands by its prior error, though it has no consequence on the applicable offense level.

could produce adjustments for the additional counts that are inadequate or excessive. If there are several groups and the most serious offense is considerably more serious than all of the others, there will be no increase in the offense level resulting from the additional counts. Ordinarily, the court will have latitude to impose added punishment by sentencing toward the upper end of the range authorized for the most serious offense." It should not and cannot be the case that *very serious* violent crimes, in particular a carjacking, do not impact the offense level and in turn the sentence for a defendant under the rubric of the Guidelines, and as this commentary makes clear, the approach to avoiding this result is the requested sentence.

The Government's requested sentence also takes into consideration both the defendant's relative criminal history and his relative young age, as he was 17 when he committed the murder as well as the out-of-state robberies, larcenies, and high-speed chases, and 18 when he menaced the young woman and her very young children and committed the armed carjacking. As with Terrell and also Centeno, who were both similarly young at the time of the murder, 19 and 18, respectively, the Government considered both those issues in agreeing to a disposition that statutorily capped their possible sentences, which otherwise would have involved a statutory and Guidelines range of up to life imprisonment for the precise conduct that they have now all admitted, the defendant included. The defendant, more like Centeno than Terrell, also has a criminal history in his young life that is independent of the instant offense conduct and serious as well as predatory. For there is a randomness and easiness to the defendant's willingness to threaten and cause death that runs through the murder of Tyrone Almodovar, the menacing of the young woman on the street, the high-speed chases in Ohio and Pennsylvania, and the carjacking that is consistent and chilling. It bears emphasis that the defendant did not possess the same personal or longstanding dispute with Almodovar that Terrell possessed and yet the defendant was prepared to murder Almodovar in the coldest blood. The young woman on the street he threatened with her children and the marihuana dealer he carjacked at gunpoint were similarly unknown to the defendant, relatively random victims. The defendant was similarly prepared to endanger the lives of many, many others during his high-speed chases even though the collateral consequence for being stopped and arrested was known to be relatively inconsequential for himself and the other members of Wash. Indeed, the lack of consequences was a principal inducement for their pandemic raiding so far and wide around the country. Thus, not only does the defendant possess a criminal history and an instant offense conduct that is itself drawn out and repeated over time, the record of the defendant's criminal activity before the Court is deeply concerning.

This last point shows how from the perspective of specific deterrence and the need to protect the public, a very significant sentence is not only justified, it is necessary. As with a number of others among his co-defendants, the defendant has shown himself to be a dangerous person, who will harm others when at liberty and for whom the experience of taking a life was not a cautionary or chastening experience, but rather one that prefigured a willingness to engage in all manner of violent criminal activity over the ensuing two years. In considering this need to ensure specific deterrence and to protect the public from further crimes of the defendant, the defendant's further criminal conduct after having committed the most serious of crimes highlights why the defendant must be separated from society.

As for general deterrence, as the Government has emphasized in connection with prior sentencings in this case, the very public celebration of acts of violence, particularly the murder of

Tyrone Almodovar, that the members of Wash, including the defendant, engaged in for months and years after their occurrence, highlights the importance of a sentence here to restoring the public perception of the consequences for such violence, particularly the taking of a human life. The defendant's celebrated reputation as a "shooter," which predated the killing of Tyrone Almodovar but grew exponentially from that crime, still exists among young people in his community given the notoriety that the members of Wash built around the murder. A very substantial sentence here will extinguish the appeal and the allure of that reputation for many young people, who can hopefully better perceive from an appropriate sentence what is the reality and the consequences for murder.

As it has repeated, not mechanically but with real feeling, the Government is sympathetic to the self-reported circumstances of the defendant's childhood, which are corroborated to a degree and challenged to a degree in the PSR's collateral interview with one of the defendant's parents. (*See* PSR ¶ 154). It is not in dispute that the defendant no doubt experienced some difficulties during his upbringing that no child should experience, as his counsel emphasizes. As previously stated, however, this fact is not even an explanation, let alone an excuse, for wanton violence and self-interested criminal activity. The Government respectfully resubmits that the circumstances of the defendant's childhood are shared by *thousands and thousands* of law-abiding citizens in the South Bronx, and cannot support a substantial downward variance, let alone in a case where the defendant is guilty of murder among other serious crimes of violence. As the Government will continue to state at sentencing in this case, the argument that the defendant is a product of growing up in a low-income and violent neighborhood ignores the fact that the overwhelming majority of citizens raised alongside him face many of the same conditions and challenges, if not worse, and yet choose to live honest, law-abiding lives from the outset of their young adulthood, attending school and working to maintain lawful employment in the hope of improving their own lives and those of their families. The defendant instead chose, day after day, for years, to involve himself with a violent gang and to make money by stealing from other people. He took one life and endangered many others. He must answer for it all now.

### Victims

At this time, the Government anticipates that up to two representatives of Tyrone Almodovar will appear and request to be heard at sentencing.

### Forfeiture

As part of his plea agreement, the defendant agreed to consent to forfeiture of $50,000 pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 1963 and 28 U.S.C. § 2461(c), for which the Government encloses a proposed order, which the parties can executed in the courtroom prior to the appearance.

### Restitution

As the Government has previously stated in connection with this case, the Government is acutely conscious of its responsibility not only to the public but also to the specific victims of crimes, particularly violent crimes, at the time of sentencing. The Government is working with the family and representatives of Tyrone Almodovar as well as multiple companies from whom

the defendant himself stole merchandise, including Target, to ascertain their compensable losses. For this reason, the Government respectfully requests that the Court set October 28, 2024 as the date for the final determination of any victims' losses pursuant to 18 U.S.C. § 3664(d)(5).

## Conclusion

For the reasons set out above, the Government respectfully requests that the Court impose a sentence of imprisonment within the range of 324 to 360 months in order to reflect the seriousness of the offense, promote respect for the law, ensure adequate specific and general deterrence, and protect the public. Given the extended duration of the offense conduct and the defendant's demonstrated recidivism, the Government respectfully requests that the Court further impose the maximum sentence of supervised release of three years.

Respectfully,

DAMIAN WILLIAMS
United States Attorney

By: *Thomas John Wright*
Courtney L. Heavey
Thomas John Wright
Assistant United States Attorneys
(212) 637-2413 / 2295

Enclosure

cc: David K. Bertan (Counsel to Defendant Lydell Seymore) (by ECF)